UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

TRASELYNN ANDERSON-POSEY, )
)
        **Plaintiff,** )
)
v. ) Case No. 16-CV-0086-CVE-FHM
)
UNUM LIFE INSURANCE COMPANY )
OF AMERICA, )
)
)
        **Defendant.** )

## OPINION AND ORDER

Plaintiff filed this action seeking, inter alia, to recover benefits and enforce her rights under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1101 et seq. (ERISA). Defendant terminated plaintiff's long term disability (LTD) benefits effective May 29, 2014. Plaintiff argues that defendant's decision to terminate her LTD benefits was arbitrary and capricious and not supported by substantial evidence. Dkt. # 46, at 21. Defendant asserts that it conducted a thorough and reasonable investigation and that its decision to terminate plaintiff's LTD benefits was based on substantial evidence. Dkt. # 55, at 27.

I.

Plaintiff is a 50-year-old married mother of three children. At the time of her disability, plaintiff was working for CVS Pharmacy, Inc. (CVS) as a pharmacist. Dkt. # 35, at 94. Through CVS, plaintiff was insured by a group disability policy issued by defendant that became effective June 1, 2009. Id. at 106. The policy provides coverage for LTD. Id. at 123. CVS is the plan administrator and fiduciary, with the authority to delegate its duties. Id. at 142. CVS delegated its

duties to defendant, and defendant acted as a fiduciary with the discretion to administer plaintiff's claim. Id. at 142-43. The policy defines disability as follows:

> You are disabled when Unum determines that:
>
> - you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> - you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury
>
> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

Id. at 123 (emphasis omitted). Duties are "material and substantial" if they "are normally required for the performance of your regular occupation" and "cannot be reasonably omitted or modified." Id. at 139. The policy states that in determining whether a claimant can perform her regular occupation, the standard is how the occupation is normally performed in the national economy, not for a specific employer or at a specific location. Id. at 141.

On June 20, 2013, plaintiff tripped and fell on a curb outside her home. The next day she saw her primary care physician, Chris Hunter, M.D., and complained of back pain and an inability to sit down. Id. at 315. Dr. Hunter ordered an x-ray of plaintiff's tailbone, diagnosed her with coccydynia (pain in the coccyx) and a dislocated coccyx, and prescribed a narcotic, Lortab, to be taken every four hours as needed for pain. Id. at 315-16. Due to her injury, plaintiff did not go back to work at CVS after her fall. Id. at 11.

On July 1, 2013, a radiologist x-rayed plaintiff's tailbone as ordered by Dr. Hunter. The radiologist found that there was "abnormal ventral angulation at the sacrococcygeal junction which probably represent[ed] traumatic injury of indeterminate age," but he did not see a definite acute fracture. Id. at 310. The same day, plaintiff had another appointment with Dr. Hunter, who

diagnosed her with a fractured coccyx and re-prescribed Lortab for pain. Id. at 311-12. On August 7, 2013, defendant received a disability status update form from Dr. Hunter in which he noted under the physical restrictions and/or limitations section that plaintiff should "avoid all aggravating activities" until plaintiff was "able to perform unrestricted work activities." Id. at 65. Dr. Hunter referred plaintiff to Traci L. White, M.D., for pain management. Plaintiff first visited Dr. White on August 19, 2013. Id. at 321. Dr. White noted that plaintiff had attempted a manual adjustment of her coccyx in July, but it had been unsuccessful. Id. Plaintiff described her pain as a constant 7/10. Id. Dr. White diagnosed plaintiff with coccydynia with a fracture at the fourth vertebra from the tip of the coccyx and scheduled her for a coccygeal ligament injection and coccyx repositioning. Id. at 322. Dr. White performed the coccygeal ligament injection on August 27, 2013. Id. at 324.

Plaintiff saw Dr. Hunter again on October 8, 2013. Id. at 307. Plaintiff told Dr. Hunter that the injection did not help and that she felt like she was watching the clock until she could take her next Lortab dose. Id. Dr. Hunter also noted that plaintiff could not go back to work if on controlled substances. Id. Dr. Hunter continued plaintiff's Lortab prescription and added prescriptions for two additional pain medications, Anaprox DS and Neurontin. Id. at 308-09. On October 9, 2013, defendant sent Dr. Hunter a letter asking him to opine on plaintiff's restrictions and limitations. Id. at 75-76. Dr. Hunter responded by stating that plaintiff was "unable to work while on controlled substances." Id. at 76. On October 29, 2013, plaintiff had another visit with Dr. Hunter. Id. at 304. Plaintiff complained of the same tailbone pain, and Dr. Hunter re-prescribed the same pain medications. Id. at 304-06. Plaintiff had an office visit with Dr. White on November 4, 2013, during which plaintiff reported that the injection did not help, but that Lortab reduced her pain from 9/10 to a 7/10. Id. at 198.

3

Dr. Hunter referred plaintiff to Clinton Baird, M.D., for a neurosurgical consultation. Plaintiff saw Dr. Baird on November 5, 2013. Id. at 234. Plaintiff reported that her pain was at a 7/10 without medication, and 4/10 or 5/10 with medication. Id. Dr. Baird told plaintiff that he would like to see a positive response to a sacrococcygeal block before seriously discussing surgical options. Id. at 235. He recommended plaintiff undergo a repeat sacrococcygeal joint injection. Id. On December 2, 2013, plaintiff visited Dr. Hunter and told him that she wanted to return to work because she was tired of not working and gaining weight. Id. at 300. Dr. Hunter added Mobic and Lyrica to the medications he prescribed for plaintiff's pain and recommended that plaintiff return to work gradually. Id. at 301-02. On December 19, 2013, Dr. White performed a ganglion impar block on plaintiff. Id. at 285.

On December 6, 2013, one of defendant's disability benefits specialists called plaintiff to gather information for plaintiff's LTD claim. Id. at 170. Plaintiff reported that her doctors had told her that her type of injury is about waiting and seeing if it would fix itself. Id. Plaintiff explained that she could not work as a pharmacist because she could not legally dispense medication while on narcotics. Id. at 171. Plaintiff stated that she could do normal household activities with breaks between tasks as long as she is on her medications. Id. On January 2, 2014, defendant received a response to the letter it had sent to Dr. Baird asking him to opine on plaintiff's restrictions or limitations. Id. at 230. Dr. Baird wrote that he had no restrictions to put on plaintiff. Id. On January 6, 2014, a nurse, acting as a clinical consultant to defendant, performed a clinical analysis of plaintiff's claim. Id. at 257. The nurse determined that plaintiff's medical record supported finding plaintiff could not return to work at that time. Id. On January 8, 2014, defendant approved plaintiff's claim for LTD benefits. Id. at 276.

4

On March 19, 2014, plaintiff had a follow-up visit with Dr. White. Id. at 350. Plaintiff reported that the ganglion impar block helped, but it had worn off. Id. Plaintiff described her pain as a 5/10, and stated that she had been able to be more active once she started taking the full amount of narcotics prescribed. Id. On April 8, 2014, Dr. White performed a repeat ganglion impar block on plaintiff. Id. at 371. On May 1, 2014, one of defendant's disability benefits specialists called plaintiff for an update on her condition. Id. at 392. Plaintiff stated that she could not return to work because she had to take narcotics, and that she could not dispense medicine while on narcotics. Id. Plaintiff explained that the pain medication reduced her reaction time and reasoning abilities, and that she could tell that her cognitive functioning was impaired while on her medication. Id.

On May 6, 2014, defendant sent Drs. Hunter and White letters asking if plaintiff could perform the cognitive and physical demands of her job on a full-time basis. Dkt. # 35-1, at 230, 234. Dr. Hunter returned the letter a few days later, asserting that plaintiff could perform her occupational demands on a full-time basis. Id. at 245. On May 13, 2014, a clinical consulting nurse of defendant reviewed plaintiff's claim and found that it was unclear whether plaintiff could return to work. Id. at 252-53. On May 22, 2014, the same nurse conducted another review of plaintiff's claim and determined that plaintiff's claim that she could not return to work because of her pain medication was not supported by the record. Id. at 260. The nurse found that plaintiff's complaints of cognitive slowing were not documented in the record, no medication side effects were noted in the record, and plaintiff's pharmacy records might be inconsistent with the amount of pain medication plaintiff reported taking. Id. The nurse also stated that it was "of note" that plaintiff renewed her pharmacy license on April 15, 2014. Id. Finally, the nurse found that no additional physician review was required because not one of plaintiff's doctors was asserting restrictions or limitations. Id. at 261.

Defendant terminated plaintiff's LTD benefits as of May 29, 2014. Id. at 269. Defendant explained that the reason for the decision was because Dr. Hunter had released plaintiff to return to work full-time. Id.

On June 9, 2014, plaintiff had an office visit with Dr. Hunter. Id. at 330. Dr. Hunter noted that plaintiff required narcotic pain control and that she could not return to work while on narcotics. Id. Dr. Hunter continued plaintiff's prescriptions for pain medications and stated that plaintiff "continues to be unemployable at her current job due to ongoing need for daily narcotic pain control." Id. at 331-32. A few days later plaintiff called defendant to report that Dr. Hunter's release of her to return to work was an error caused by a miscommunication within his office. Id. at 296. On June 13, 2014, defendant sent a letter to Dr. Hunter asking him to opine on plaintiff's ability to perform her occupational demands on a full-time basis. Id. at 310. Dr. Hunter responded by crossing out the yes or no check boxes and writing that plaintiff had "a chronic coccydynia that require[d] chronic narcotic pain management for [her to] function. Despite [being] physically able to perform tasks, she [could] not be on duty on narcotics per her employer[,] and as such [was] disabled from her current profession." Id. at 317. On June 2, 2014, Dr. White responded to defendant's May 6, 2014 letter by stating that plaintiff would need a functional capacity exam (FCE) before she could opine on plaintiff's ability to return to work and asking defendant to authorize an FCE to be scheduled. Id. at 289.

On July 9, 2014, defendant sent Dr. Hunter a letter asking him to clarify his position on plaintiff's ability to return to work. Id. at 350. The letter stated that Dr. Hunter's records did not indicate that he found evidence of cognitive impairment or recommended plaintiff be restricted from "activities requiring sustained attention such as driving." Id. at 350-51. At the end, the letter asked

6

the following: "On preliminary review, the available medical records <u>do not appear to support</u> that the claimant is precluded from the functional capacity to perform the physical or cognitive demands of her occupation as performed in the national economy as outlined above. Do you agree?" <u>Id.</u> at 351-52. On July 15, 2014, Dr. Hunter replied to the letter, asserting that he did not agree. <u>Id.</u> at 365. Dr. Hunter explained that "per her work requirements and employer policy, she is unable to work with narcotics in her system. This could be noted up to at least 48 hours after her last dose." <u>Id.</u>

In response to the clarification of Dr. Hunter's opinion, defendant opened a new review of plaintiff's LTD claim. <u>Id.</u> at 306. As part of the review, defendant had two consulting physicians review plaintiff's record, William Fox, M.D., and Joseph Sentef, M.D. On July 15, 2014, Dr. Fox opined that he did not believe there was a medical disagreement regarding plaintiff's capacity. <u>Id.</u> at 369. Rather, Dr. Fox stated that "any disagreement revolves around the question whether [plaintiff] needs to be narcotic free to perform her occupational demands versus her job." <u>Id.</u> In a more extensive report on July 29, 2014, Dr. Fox opined that plaintiff was not disabled because the record did not support that plaintiff's narcotic therapy adversely affected plaintiff's cognitive capacity or that her narcotic regimen necessarily precluded plaintiff from working as a pharmacist. <u>Id.</u> at 416. The next day, Dr. Sentef wrote a report agreeing with Dr. Fox's assessment of plaintiff's claim. <u>Id.</u> at 423-24. Dr. Sentef opined that "[o]ne would think if she can drive, her analgesic medication would have minimal effect cognitively." <u>Id.</u> at 424. On July 31, 2014, defendant informed plaintiff that the latest review of her claim did not change defendant's decision to terminate her LTD benefits. <u>Id.</u> at 432. In support of its decision, defendant cited to plaintiff's ability to drive, the renewal of her pharmacy license, Dr. Hunter's failure to assert that the narcotics cognitively impaired plaintiff, and plaintiff's increased daily activities. <u>Id.</u> at 433-34.

Plaintiff appealed defendant's termination of her LTD benefits. Id. at 450. Plaintiff argued that the duties of a pharmacist could not be performed while on narcotics. Id. at 537. In support of her argument, plaintiff asserted that CVS fired her because she needed to be on narcotics. Id. Plaintiff provided defendant with email correspondence, in which plaintiff asked CVS, "I want to know if I have a release from my doctor to come back to work but am still taking norco 10 qid will cvs let me come back?" Id. at 540-41. CVS replied that it would "need [a] 100% release from [plaintiff's leave of absence] with no restrictions" before plaintiff could return to work. Id. at 540.

On March 30, 2015, Beth Schnars, M.D., a medical consultant for defendant, reviewed plaintiff's claim. Id. at 564-67. Dr. Schnars agreed with Drs. Fox and Sentef that the record did not support finding plaintiff disabled. Dr. Schnars opined that the medical record did not document any side effects from plaintiff's pain medication. Id. at 565. Further, Dr. Schnars noted that plaintiff's pharmacy records indicate that she filled prescriptions for narcotic pain medications prior to her tailbone injury. Id. at 567. On April 8, 2015, in-house counsel for defendant responded to a request for legal advice regarding plaintiff's ability to return to work. Dkt. # 44-1, at 2. Counsel opined:

> if a claimant must take narcotics, and if the narcotics would render her unable to perform her occupation (as it is normally performed in the national economy, not necessarily as required by a particular employer), then it would be reasonable to consider the claimant disabled within the meaning of the policy. However, even if the required taking of narcotic medicine would disable a claimant, the claimant would not be disabled if she did not have a medical condition that would be generating disabling pain, or if she had such a condition but the pain could be controlled through non-narcotic medicine.

Id. The same day, Dr. Schnars was asked whether there was evidence to support that plaintiff had an ongoing medical condition that would generate disabling pain, and if so, whether non-narcotic medicine could be used to control her pain. Dkt. # 35-1 at 576. Dr. Schnars answered:

> No. As noted previously, the initial imaging studies documented no evidence of acute fracture but an abnormal angulation which could represent a traumatic injury. If indeed the findings represented a subacute fracture of the coccyx, the natural course of healing would be around 8 weeks. There has been no additional diagnostic imaging studies recommended such as CT or MRI to further delineate underlying organic etiologies for reported pain. The medical records provided do not document identifiable physiologic abnormalities of the axial spine or pelvic bones which would necessitate use of chronic opioid medication.

Id.

On April 14, 2015, defendant denied plaintiff's appeal. Id. at 583. Defendant provided two general bases for its decision. First, defendant asserted that the record did not support any cognitive deficiencies while plaintiff was on narcotics, and plaintiff had failed to prove she could not work as a pharmacist while on narcotics. Id. at 586-87. Second, defendant asserted that the record did not "document physiologic abnormalities, which would necessitate the ongoing use of chronic opioid medication." Id. at 588. On February 10, 2016, plaintiff filed this action seeking, inter alia, to recover benefits and enforce her rights under ERISA. Dkt. # 2.

**II.**

As a preliminary matter the Court must establish the proper standard of review for plaintiff's ERISA claim. Plan beneficiaries, like plaintiff, have the right to federal court review of benefit denials and terminations under ERISA. "ERISA was enacted to promote the interests of employees and their beneficiaries in employee benefit plans." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 113 (1989). Specifically, 29 U.S.C. § 1132(a)(1)(b) grants plaintiff the right "to recover benefits due to [her] under the terms of the plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." The default standard of review is de novo. However, when a plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of a plan, a challenge under

9

§ 1132(a)(1)(B) is to be reviewed under an arbitrary and capricious standard. See Firestone, 489 U.S. at 115 (applying a deferential standard of review when the plan administrator or fiduciary has discretionary authority to determine eligibility for benefits or to construe the terms of a plan).

The parties agree that the arbitrary and capricious standard applies in this case. Dkt. # 46, at 20; Dkt. # 55, at 7-8. Under the "pure" version of this standard, a plan administrator's or fiduciary's decision will be upheld "so long as it is predicated on a reasoned basis." Adamson v. Unum Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006). That basis "need not be the only logical one nor even the best one." Nance v. Sun Life Assur. Co. of Can., 294 F.3d 1263, 1269 (10th Cir.2002) (quoting Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir.1999)). The decision merely must "reside[] 'somewhere on a continuum of reasonableness – even if on the low end." Adamson, 455 F.3d at 1212 (quoting Kimber, 196 F.3d at 1098). A plan's decision will not be set aside "if it was based on a reasonable interpretation of the plan's terms and was made in good faith." Trujillo v. Cyprus Amax Minerals Co. Ret. Plan Comm., 203 F.3d 733, 736 (10th Cir. 2000).

By contrast, "[i]ndicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by a fiduciary." Caldwell v. Life Ins. Co. of N. Am., 287 F.3d 1276, 1282 (10th Cir. 2002). The Tenth Circuit has held that "'[s]ubstantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].' Substantial evidence requires 'more than a scintilla but less than a preponderance.'" Sandoval v. Aetna Life & Cas. Inc. Co., 967 F.2d 377, 382 (10th Cir. 1992) (citation omitted). In reviewing the plan administrator's or fiduciary's decision, the reviewing court generally is "limited to the 'administrative record' – the materials compiled by the [decisionmaker] in the course of making [the] decision." Hall v. Unum Life Ins. Co. of Am., 300 F.3d 1197, 1201

(10th Cir. 2002). The reviewing court should give less deference to a decision if the plan administrator or fiduciary fails to gather or to examine relevant evidence. Caldwell, 287 F.3d at 1282.

If an ERISA fiduciary plays more than one role – i.e., deciding eligibility and paying benefits claims out of its own pocket – a conflict of interest arises. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 112 (2008); Graham, 589 F.3d at 1358. In Glenn, the Supreme Court rejected any argument that this conflict of interest requires courts to shift the burden of proof to the plan administrator in cases where a conflict of interest exists. Glenn, 554 U.S. at 117. "Glenn embraces . . . a 'combination-of-factors method of review' that allows judges to 'tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together.'" Holcomb v. Unum Life Ins. Co. of Am., 578 F.3d 1187, 1193 (10th Cir. 2009) (quoting Glenn, 554 U.S. at 118). "A conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy . . . .'" Id. (quoting Glenn, 554 U.S. at 117).

Defendant acknowledges it has an inherent conflict of interest as both the administrator and payor of plaintiff's claim. Dkt. # 55, at 8. Consistent with Glenn and Tenth Circuit precedent, the Court will "dial back" its deference to defendant's decision and give some weight to defendant's inherent conflict of interest. See Weber v. GE Grp. Life Assur. Co., 541 F.3d 1002, 1010 (10th Cir. 2008). Plaintiff argues that defendant's conflict of interest in this case was particularly influential because plaintiff's benefits totaled over eighty thousand dollars a year and would not terminate until 2031. Dkt. # 46, at 27. However, plaintiff admits that under the policy the definition of disabled

11

changes after two years of LTD benefits, and that defendant has not evaluated her under the second disability standard. Dkt. # 62, at 10 n.5. If plaintiff were unable to perform her occupation as a pharmacist for at least two years, she would be entitled to a total of approximately $160,000 under the initial disability standard. This sum, while substantial, is not so large that it alone would necessitate <u>additional</u> dialing back of the deference afforded to defendant's decision. As plaintiff has not cited any other evidence showing that the conflict of interest was particularly important in this case, the Court will not substantially reduce the level of deference to defendant's decision. <u>See</u> <u>Holcomb</u>, 578 F.3d at 1193.

### III.

Plaintiff argues that defendant's decision to terminate her LTD benefits was arbitrary and capricious because it was not supported by substantial evidence. Dkt. # 46, at 21. Defendant provided two reasons for terminating plaintiff's LTD benefits: (1) that the record did not support cognitive impairment from plaintiff's narcotic pain medication, and (2) that the record did not support a disabling physical condition that required pain management with narcotics. <u>See</u> Dkt. # 35-1, at 583-89. The Court will address each basis for the termination of plaintiff's LTD benefits in turn.

### A.

Narcotic pain medication can impair cognitive functioning. Dkt. # 35-1, at 415. Defendant asserts that, in plaintiff's case, the narcotics did not impair her cognitive functioning. Dkt. # 55, at 32-33. Thus, defendant argues that plaintiff was not disabled because she could perform the cognitive demands of her job. <u>Id.</u> Plaintiff argues that defendant's decision was arbitrary because

12

the record shows that she was impaired by the narcotics, and CVS fired her because she could not work while on narcotics. Dkt. # 46, at 22, 25.

Regardless of whether plaintiff's narcotics impaired her cognitive functioning, defendant's decision that plaintiff could work as a pharmacist while on narcotics is unreasonable. The Oklahoma Administrative Code states that it is a violation of professional conduct for a pharmacist to practice "without reasonable skill and safety by reason of illness, use and/or abuse of drugs, narcotics, chemicals, or any other type of material, or as a result of any mental or physical condition." Okla. Admin. Code § 535:10-3-1.2(5). CVS's policy is that pharmacists may not work while on any narcotics.[1] Dkt. # 35-1, at 540. Defendant argues that Oklahoma does not have a bright line rule against practicing pharmacy while on narcotics, and that even if CVS has such a policy, the analysis is whether plaintiff could be a pharmacist in the national economy, not at CVS specifically. Dkt. # 55, at 33.

Although Oklahoma does not have a bright line rule against working as a pharmacist while on narcotics, it has a reasonableness test that specifically mentions the use of narcotics. Although the Court could not find any Oklahoma law interpreting this reasonableness standard as applied to pharmacists practicing while on narcotics, common sense dictates that a pharmacist working with any narcotics in her system is not practicing with reasonable skill or safety. Working as a pharmacist

---

[1] Defendant's argument that CVS's policy was unclear or not supported by the record, see Dkt. # 55, at 33, is entirely unpersuasive. CVS's response to plaintiff's email inquiry, when read in context of the entire email chain, indicates that CVS would not allow a pharmacist to work while on narcotics. See Dkt. # 35-1, at 540-41. This conclusion is further supported by the fact that CVS actually fired plaintiff because she needed to be on narcotics. Even if defendant somehow viewed the evidence of CVS's policy as ambiguous, it had a duty to ask CVS what its policy was on the issue. See Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 808 (10th Cir. 2004) ("An ERISA fiduciary presented with a claim that a little more evidence may prove valid should seek to get to the truth of the matter.").

takes a great deal of reasoning and cognitive focus. A pharmacist must verify the accuracy of prescriptions, evaluate drug interactions, confirm that the drugs prescribed correspond to the conditions diagnosed, and accurately dispense the correct prescriptions. See Dkt. # 35, at 172. Moreover, the consequences of error include serious injury and death. CVS obviously believes that it is unreasonably risky to allow a pharmacist to practice while on any narcotics. Defendant did not investigate the policies of other pharmacies in the national economy, but the Court is doubtful any other pharmacy would disagree with CVS's position.

Further, the record shows that plaintiff's cognitive abilities were diminished by the narcotics. Plaintiff has consistently claimed that her pain medication makes her thinking fuzzy and slow. See e.g., Dkt. # 35, at 171-72, 392-93. For example, plaintiff told defendant that when her step-son was put on a new medication and asked her how it worked, she recognized the name and knew what it was for, but it was a struggle to remember how it worked and was second guessing herself. Id. at 393. Plaintiff further explained that when she is not on pain medication she would know how the drug worked "like she knows the back of [her] hand." Id. Moreover, Dr. Hunter has repeatedly asserted that plaintiff cannot work as a pharmacist while on narcotics. See Dkt. # 35-1, at 317, 365. Despite defendant's argument that Dr. Hunter never asserted that plaintiff was cognitively impaired by her medication, the most obvious interpretation of Dr. Hunter's statements is that plaintiff can physically do her job, but the narcotics impair her mentally. To support its argument that plaintiff was not impaired by her narcotics, defendant points to plaintiff's regular driving and the renewal of her pharmacy license. Dtk. # 35-1, at 586-87. Despite Dr. Sentef's opinion that if plaintiff could drive, she could do her job, driving and working as a pharmacist do not require equal cognitive functioning. Driving requires focus and attention, but working as a pharmacist requires hours of

14

calculating doses, recalling diseases and the uses of medications, and understanding drug interactions. Additionally, plaintiff's renewal of her pharmacy license does not indicate that she could work while on narcotics. There is no evidence that plaintiff worked while on narcotics[2] or had any intention of working on narcotics, and the record indicates that plaintiff was a qualified pharmacist when not on narcotics. Given that plaintiff expected to eventually not need narcotics to function and wished to return to work at that time, plaintiff's renewal of her license seems to have nothing to do with narcotics and everything to do with keeping her license up to date so she could return to work as soon as she was off narcotics. Therefore, defendant's decision that plaintiff could return to her job as a pharmacist while on narcotics was arbitrary and capricious because it was unreasonable and not supported by substantial evidence.

## B.

Defendant also supported its decision to terminate plaintiff's LTD benefits by arguing that the record did not show plaintiff had a disabling condition that required narcotics for pain management. Id. at 586. Throughout its decisionmaking process, defendant relied on the argument that plaintiff was not cognitively impaired by her medication to support its termination of her benefits. However, after completion of the medical review on appeal, defendant asked Dr. Schnars to opine on whether there was evidence to support that plaintiff had an ongoing medical condition that would generate disabling pain, and if so, whether non-narcotic medicine could be sued ton control her pain. Id. at 576. Dr. Schnars replied that the record did not show plaintiff had a condition that would generate disabling pain because the initial x-ray did not definitively show an acute

---

[2] There is evidence that plaintiff filled prescriptions for narcotics before she stopped working. See Dkt. # 35-1, at 567. However, there is no indication that plaintiff ever worked while on the medication.

15

fracture, a coccyx fracture would be expected to heal within 8 weeks, and no additional testing had been provided showing a basis for disabling pain. Id. Dr. Schnars's handful of sentences opining on defendant's "addendum question," appear to be the entire basis of defendant's argument that plaintiff does not have a condition requiring narcotic pain medication.

While Dr. Schnars's brief opinion contains the type of analysis that could support finding plaintiff not disabled, on its own Dr. Schnars's addendum opinion is insufficient to constitute substantial evidence. Until days before plaintiff's appeal was denied, the clear focus of defendant's investigation was whether plaintiff was cognitively impaired due to her pain medication. Once Dr. Hunter clearly opined that plaintiff could not return to work while taking narcotics, defendant's medical consultants treated whether plaintiff was cognitively impaired by her pain medication as the key question to answer in evaluating plaintiff's claim. See id. at 415-17, 423-24, 567. To question whether plaintiff's narcotics regimen was necessary seems not to have occurred to anyone reviewing plaintiff's claim until it was raised by in-house counsel. See Dkt. # 44-1, at 2. In fact, Drs. Fox and Sentef appear to have assumed that plaintiff's narcotics regimen was necessary. See Dkt. # 35-1, at 416, 424.

The problem here is not that the question was raised late in the proceedings by defendant's counsel, but that the answer provided was underdeveloped. "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker." Rekstad v. U.S. Bancorp, 451 F.3d 1114, 1119-20 (10th Cir. 2006). Although Dr. Schnars's opinion raises doubts as to whether plaintiff had a disabling condition that required treatment with narcotics, a few sentences written after a review of plaintiff's record by only one of defendant's medical consultants is not enough evidence for a reasonable mind to accept it as adequate support

16

for defendant's decision. "Substantiality of the evidence is based on the record as a whole." Caldwell, 287 F.3d at 1282. A brief opinion written the day before plaintiff's appeal was denied is simply insufficient to constitute substantial evidence. Thus, considering the record as a whole, substantial evidence does not support defendant's decision to terminate plaintiff's LTD benefits on the basis that plaintiff did not have a disabling condition that required narcotic pain medication, and defendant's decision was therefore arbitrary and capricious.

## C.

Having concluded that defendant's decision was arbitrary and capricious, the Court must determine the proper remedy. Plaintiff asks the Court to retroactively reinstate her LTD benefits for the period from May 28, 2014 to December 20, 2015. Dkt. # 62, at 10. Defendant asks the Court to remand the matter to defendant for further review of plaintiff's claim. Dkt. # 55, at 35. The Tenth Circuit has given district courts the following guidance in deciding whether to remand a case to the plan administrator for a review of plaintiff's case or award a retroactive reinstatement of benefits:

> Which of these two remedies is proper in a given case, however, depends upon the specific flaws of the plan administrator's decision. In particular, if the plan administrator "fail[ed] to make adequate findings or to explain adequately the grounds of [its] decision," the proper remedy "is to remand the case to the administrator for further findings or explanation. In contrast, a retroactive reinstatement of benefits is proper where, but for the plan administrator's arbitrary and capricious conduct, the claimant "would have continued to receive the benefits or where there [was] no evidence in the record to support a termination or denial of benefits."

DeGrado v. Jefferson Pilot Fin. Ins. Co., 451 F.3d 1161, 1175-76 (10th Cir. 2006) (alterations in original) (citations omitted). Here, remand is the proper remedy because defendant failed to make adequate findings to support its assertion that plaintiff was not disabled because she did not need to

17

take narcotic pain medication. This issue has not been fully investigated, and because it arose late in the proceedings, plaintiff did not have the opportunity to respond to it before seeking review in this Court. Because the Court cannot say that there is no evidence to support defendant's decision, or that the evidence so clearly points the other way as to make a remand unnecessary, remand is the proper remedy. See id. at 1176.

**IT IS THEREFORE ORDERED** that defendant's decision to terminate plaintiff's LTD benefits is **reversed and remanded**. A separate judgment is entered herewith.

**DATED** this 23rd day of February, 2017.

_____
CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE